ELWOOD GRAIN CO. v. ST. JOSEPH & G. I. RY. CO.

(Circuit Court of Appeals, Eighth Circuit.  January 10, 1913.)

No. 3,715.

1. CARRIERS (§ 35*)—CONTRACT—VALIDITY—DETERMINATION—TIME.

In a suit to recover from a railroad company a certain sum per car which the railroad company had contracted to pay to an elevator company on all grain received by the elevator from stations on the line of the railroad company and unloaded into the elevator in order to induce the construction of the elevator, the validity of the contract as against the provisions of the Elkins Act (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1911, p. 1309]) and Hepburn Act (Act June 29, 1906, c. 3591, 34 Stat. 584 [U. S. Comp. St. Supp. 1911, p. 1288]) should be determined as of the date of the performance of the service sued for and not as of the date of the making of the contract.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 94; Dec. Dig. § 35.*]

2. CARRIERS (§ 32*)—INTERSTATE COMMERCE—ELEVATOR CHARGE.

A contract by an interstate railroad company to pay an elevator company $1.75 per car on all grain received from stations on its line of railroad and passing through the elevator, not allowed to all elevators in general, nor covered by a published and filed rate schedule, was void.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. § 32.*].

In Error to the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

Action by the Elwood Grain Company against the St. Joseph & Grand Island Railway Company. Judgment for defendant, and plaintiff brings error. Affirmed.

John E. Dolman, of St. Joseph, Mo., for plaintiff in error.
R. A. Brown, of St. Joseph, Mo., for defendant in error.

Before ADAMS and SMITH, Circuit Judges, and WILLARD, District Judge.

PER CURIAM. The plaintiff in error, who was the plaintiff below, seeks to recover from the defendant $1.75 a car for unloading 5,000 cars of grain at the plaintiff's elevator at Elwood, Kan.

The contract, so far as material in this case, is as follows:

"Whereas, Harroun Brothers, a copartnership of St. Joseph, Missouri, composed of A. L. Harroun, W. H. Harroun and A. M. Harroun, are desirous of locating and building a grain elevator of large capacity near the station of Elwood in the state of Kansas, on the line of the St. Joseph & Grand Island Railway Company as a commercial enterprise for private gain and profit, and whereas said railway company, a corporation created, organized and existing under and by virtue of the laws of the states of Kansas and Nebraska, believes through its board of directors and authorized agents that such an enterprise would be of great advantage to its business as a common carrier and is desirous of having said Harroun Brothers locate and build said grain elevator at said point: Now, therefore, these articles of agreement made and entered into this 3d day of May, 1899, by and be-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tween the St. Joseph & Grand Island Railway Company, party of the first part, and said Harroun Brothers, parties of the second part, witnesseth:

### "(1) Cost and Construction of Plant.

"Said parties of the second part in consideration of the agreements and covenants hereinafter named and entered into by said party of the first part, by the said party of the first part to be kept and performed, hereby agree that, at or as soon after the execution of this agreement as may be feasible and convenient, they will purchase a real estate site at or near said station of Elwood adjoining property owned at or near said point by said party of the first part, provided that good and lawful title thereto can be secured, and that they will erect on such site without unnecessary delay a grain elevator and that they will maintain and operate the same on said site so purchased or to be purchased upon the terms and conditions hereinafter set forth. Said elevator shall contain all modern improvements for cleaning, handling and transferring grain, with a storage capacity of not less than three hundred and fifty thousand (350,000) bushels, and with a handling capacity of eight (8) cars per hour.

### "Operations of Plant as to Loading of Cars to be Under Instructions of First Party.

"After said elevator shall have been completed, as above provided, and its operation shall have been commenced said parties of the second part hereby agree to unload promptly all cars set to said elevator by said first party for such purposes and to load all cars set to said elevator by the first party for the purpose of being loaded thereat with such quantity of grain and to such extent in weight as the said party of the first part may direct by its instructions to be issued to the said parties of the second part from time to time.

### "To so Use Plant so as to Benefit Grain Shipping Interest of First Party.

"Said parties of the second part further agree in consideration of the covenants and agreements herein contained, by the said party of the first part to be kept and performed, so to conduct and operate said elevator that the grain carrying business of said first party will be materially benefited thereby and to use all opportunities arising from the operation of said elevator for building up and strengthening the grain shipping interests along the line of said first party's railway. * * *

"(2) (b) Said party of the first part also agrees to allow said second parties, free of charge, a six months' transit privilege on all grain stopped at said elevator for cleaning or storage purposes, or for inspection, and to protect, on all such grain so stopped, the same through rate of freight as would have been applied had no such stop been made, excepting from this provision, however, the necessary switching charges, as hereinafter provided in paragraph 'd.' * * *

### "First Party Pays Second Party $1.75 Per Car.

"(e) Said party of the first part agrees to pay said second parties the sum of one dollar and seventy-five cents ($1.75) per car on all grain received by said second parties from stations on its line of railway and unloaded into said elevator. * * *

"(5) This contract shall be in force and effect from August 1, 1899, for the full term of twenty (20) years, except it may be abrogated by the mutual consent of the parties hereto at an earlier date. At the end of twenty years either party may terminate the same by giving a six months' notice in writing to the other of a purpose so to do."

The contract contained other provisions relating to switching, demurrage, construction of tracks, and free passes to certain employés of Harroun Bros., which are not, however, important in this case. It will be noticed that the contract was made on May 3, 1899, and be-

fore the passage of the Elkins Act, February 19, 1903 (32 Stat. 847, c. 708 [U. S. Comp. St. Supp. 1911, p. 1309]). The cars in question were all unloaded after the passage of the Hepburn Act, June 29, 1906 (34 Stat. 584, c. 3591 [U. S. Comp. St. Supp. 1911, p. 1288]). Payments were made under the contract at the rate of $1.75 per car until the passage of the Elkins Act. After that time an allowance was made at the rate of 1¼ cents per hundredweight, which increased the payment to about $7 or $8 per car. A witness for the plaintiff testified that this allowance was for the same service as was the allowance of the $1.75 mentioned in the contract. Later the allowance was changed to ¾ of a cent per hundredweight.

All of the grain originated at points in Nebraska on the defendant's road, and was billed to St. Joseph, Mo., which is on the opposite side of the Missouri river from Elwood, Kan. It was all billed on a through rate, and after remaining in the elevator for a period ranging from 20 days to 3 months it was shipped out of the elevator on the through rate. Practically all of it was owned by the plaintiff.

[1] Whether or not this contract was valid when it was made we shall not stop to inquire. If when the service was performed it violated any of the provisions of the Elkins Act or of the Hepburn Act, it was void, and no recovery can be had thereon. Louisv. & Nash. R. R. Co. v. Mottley, 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; Phil., Balt. & Wash. R. R. Co. v. Schubert, 224 U. S. 603, 614, 32 Sup. Ct. 589, 56 L. Ed. 911.

[2] The question then is this: Were such a contract to be made now, would it be valid? That this was a service performed "in connection with the receipt, delivery, elevation and transfer in transit, ventilation or icing, storage and handling of property transported" in interstate commerce, is apparent. That this allowance of $1.75 per car gave the plaintiff an advantage over other owners of elevators similarly situated who transferred their own grain through such elevators in interstate commerce is also apparent. It is not pretended that this allowance was open to all such other owners of elevators. It is not pretended that this allowance was ever published in the tariffs of the defendant.

Under these circumstances, the case is ruled by Chic. & Alton R. R. Co. v. Kirby, decided by the Supreme Court of the United States, May 27, 1912 (225 U. S. 155, 32 Sup. Ct. 648, 56 L. Ed. 1033). In that case, among other things, it was said:

"The declaration in substance avers that the plaintiff in error knowing the anxiety of the shipper for quick transportation, and that the horses were to enter the horse sale to be held late in the month, did, on January 24, 1906, contract and agree to carry a car, rented by defendant in error, loaded with horses, for the consideration of $170.60 over its own rails from Springfield to Joliet, Ill., and there deliver so that it would be carried by a fast stock train known as the 'Horse Special,' over the M. C. Railroad, through to New York. Said Horse Special was run but three times each week, and was due to leave Joliet the following morning. It is then alleged that the defendant in error, as directed by the railroad company, delivered and loaded his horses on the afternoon of the 24th; but that the company did not promptly carry and deliver the same to the said fast stock train on the morning of the 25th, as it had guaranteed to do, having failed to make con-

nection with that train; and that, as a consequence, the car was forwarded by a later and much slower train, and the horses were delivered in New York 48 hours after they would have arrived had they been carried by the Horse Special, as the plaintiff in error undertook. As a result of this prolonged transportation, the horses did not reach New York in time to be put in proper condition for the horse sale, whereby the defendant in error sustained damages, aggregating several thousand dollars. * * *

"The single federal question arises upon the validity of the contract to so carry these horses as to deliver them at Joliet to be carried through to New York by the Horse Special, leaving Joliet on the 25th of January.

"That the railroad company had established and published through joint rates and charges upon car load shipments of live stock to New York is not disputed. The rates furnished the defendant in error were the regularly published rates. Those rates and schedules did not provide for an expedited service, nor for transportation by any particular train. Neither was Kirby required to pay any other or higher rate for the promised special service, by which his car was to be carried so as to be attached to the fast stock special and carried by it to New York. * * *

"The implied agreement of a common carrier is to carry safely and deliver at destination within a reasonable time. It is otherwise when the action is for a breach of a contract to carry within a particular time, or to make a particular connection, or to carry by a particular train. The railroad company, by its contract, became liable for the consequence of a failure to transport according to its terms. Evidence of diligence would not excuse. If the action had been for the common-law carrier liability, evidence that there had been no unreasonable delay would be an answer. But the company, by entering into an agreement for expediting the shipment, came under a liability different and more burdensome than would exist to a shipper who made no such special contract.

"For such special service and higher responsibility it might clearly exact a higher rate. But to do so it must make and publish a rate open to all. This was not done.

"The shipper, it is also plain, was contracting for an advantage which was not extended to all others, both in the undertaking to carry so as to give him a particular expedited service, and a remedy for delay not due to negligence.

"An advantage accorded by special agreement which affects the value of the service to the shipper and its cost to the carrier should be published in the tariffs, and for a breach of such a contract relief will be denied, because its allowance without such publication is a violation of the act. It is also illegal because it is an undue advantage in that it is not one open to all others in the same situation. * * *

"The broad purpose of the Commerce Act was to compel the establishment of reasonable rates and their uniform application. That purpose would be defeated if sanction be given to a special contract by which any such advantage is given to a particular shipper as that contracted for by the defendant in error. To guarantee a particular connection and transportation by a particular train was to give an advantage or preference not open to all and not provided for in the published tariff."

## The plaintiff insisted at the trial that:

"These tariffs did not cut any figure in the case, none in the world. They cannot change this contract by putting a tariff into effect on something that does not affect the merits of the case."

## And in its brief in this court it says:

"If therefore the contract is a valid one, the railway company cannot refuse to publish the charge in its schedules and then seek to annul it under the pretext that under section 6 of the Interstate Commerce Act [Act Feb. 4, 1887, c. 104, 24 Stat. 380 (U. S. Comp. St. 1901, p. 3158)] it cannot pay the same, because it is not specified in its tariff."

Upon this point the Supreme Court in the Kirby Case, above cited, said:

"That the defendant in error did not see and did not know that the published rates and schedules made no provision for the service he contracted for is no defense. For the purpose of the present question he is presumed to have known. The rates were published and accessible, and, however difficult to understand, he must be taken to have contracted for an advantage not open to others. Railway Co. v. Mugg, 202 U. S. 242 [26 Sup. Ct. 628, 50 L. Ed. 1011]."

. In Union Pacific R. R. Co. v. Updike Grain Co., 222 U. S. 215, 32 Sup. Ct. 39, 56 L. Ed. 171; s. c., 178 Fed. 223, 101 C. C. A. 583, the allowance there held valid was open to all elevators, and it was published in the tariffs of the railroad company.

The judgment of the court below is affirmed, with costs.